IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **BRANDON WATSON,** | * | |
| Plaintiff | * | |
| v. | * | CIVIL NO. JKB-15-0307 |
| **CITY OF ABERDEEN** *et al.*, | * | |
| Defendants | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

*I. Background*

Plaintiff Brandon Watson sued the City of Aberdeen, Maryland, the Aberdeen Police Department, and Aberdeen Police Officers Thaddeus Tomlinson,[1] Raul Forsmark, John Divel, Craig Gentile, and Fredrick Harry Budnick; Watson claimed a violation of his federal civil rights, battery, false arrest, false imprisonment, intentional infliction of emotional distress, gross negligence, negligent retention and hiring, and violation of the Maryland Declaration of Rights, Articles 24 and 26. (Compl., ECF No. 2.) The case was removed to this Court (ECF No. 1), and Defendants filed a motion to dismiss (ECF No. 7). The motion was granted in part and denied in part. (ECF No. 14.) The Aberdeen Police Department was dismissed from the case; the City of Aberdeen was dismissed from all counts except Count VIII (claiming violation of the Maryland Declaration of Rights); the police officers sued in their official capacities were dismissed from Count I (brought pursuant to 42 U.S.C. § 1983); and Count VII (claiming negligent hiring and retention) was dismissed. (*Id.*) Later, the Court ruled that Watson had substantially complied

---

[1] Tomlinson's name was incorrectly spelled in the complaint as "Thomilson." The Clerk will be directed to amend the docket to reflect the correct spelling of his name.

with the Maryland Local Government Tort Claims Act's notice provision and denied the remaining portion of the motion to dismiss. (ECF No. 22.)

After the parties were afforded a discovery period (ECF No. 19), Defendants filed a motion for summary judgment (ECF Nos. 24 & 25), to which Watson filed his response in opposition (ECF No. 26) and for which Defendants filed their reply (ECF No. 27). No hearing is necessary. Local Rule 105.6 (D. Md. 2014). The motion will be granted.

## II. *Standard for Summary Judgment*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal

knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

### III. Facts

Preliminarily, the Court notes that Defendants have provided a detailed statement of facts, supported by citations to evidence (Defs.' Mot. Supp. Mem. 3-11), whereas Watson has merely reiterated the allegations of his complaint with no citations to evidence (Pl.'s Opp'n 3-5). Watson's opposition has thus "rest[ed] upon the mere allegations . . . of his pleading" and his counsel's arguments. It is not this Court's duty to ferret out specific facts in the record to support Watson's opposition.

Defendants do not contest certain allegations in the complaint setting forth the factual scenario that precipitated this lawsuit, and those uncontested allegations will be cited accordingly; otherwise, citations will be made to specific items of evidence. As noted in Defendants' statement of the facts, a robbery occurred at the Exxon gas station at 7 North Philadelphia Boulevard in Aberdeen, Harford County, Maryland, on January 30, 2014, about 11:40 p.m. Approximately $500 was taken from the cash register. (Compl. ¶ 13.) After removing the money from the cash register, the suspect ran out the same door he entered and ran in the direction of the train station. (*Id.* ¶ 14.) The first officer on the scene was Defendant Gentile, followed by Defendant Forsmark. (*Id.* ¶¶ 13-14.) Gentile reviewed the gas station's surveillance video and provided a description of the suspect to other officers, indicating the suspect was a white or light-skinned black male, wearing dark clothing, a black ski mask, and light-colored or white shoes, but no gloves. (*Id.* ¶ 14.) The scene was dusted for fingerprints, but none were recovered. (*Id.* ¶ 15.)

Gentile attested that his review of the video at the gas station shortly after the robbery was made difficult by poor quality of the video and/or monitor on which he viewed it; as a result, he had difficulty determining whether the robbery suspect was a white male or a light-skinned black male. (Gentile Aff. ¶ 5, Nov. 3, 2015, Defs.' Mot. Ex. D.) Once Gentile left the scene, he had no further involvement with the investigation of the robbery and he was not present for any of the other events about which Plaintiff has complained in this lawsuit. (*Id.* ¶¶ 7-9.) Forsmark authored the incident report, which reflected Gentile's and Forsmark's uncertainty as to whether the suspect was white or black, but which repeated the description as either a white male or light-skinned black male. (Defs.' Mot. Ex. E.) Forsmark spoke to the store employee who was present when the suspect removed the cash from the register as well as the manager who was in the restroom at the time of the robbery. (Forsmark Aff. ¶¶ 8-9, Nov. 8, 2015, Supp. Ex. G, ECF No. 25.) After Forsmark processed the scene, he was no longer involved with the investigation of the robbery and was not present for any of the other events about which Plaintiff has complained. (*Id.*)

On February 4, 2014, Defendant Detective Divel went to the gas station and interviewed the employees about the robbery. (Compl. ¶ 17.) He viewed the surveillance video of the robbery and determined that it showed "a short black male, approximately 5'6" tall . . . wearing dark pants, a dark jacket with a white emblem on the left upper portion of his chest, white sneakers with black trim, and a black ski mask covering his face except for the area around his eyes." (Divel Aff. ¶¶ 3-4, Nov. 4, 2015, Defs.' Mot. Ex. A.) After talking with gas station employees who indicated their belief that the suspect was a regular customer, Divel requested surveillance video footage from two days before to two days after the robbery. (*Id.* ¶¶ 5, 7-8.) He obtained the footage and when he was reviewing it, he "observed an African American male,

about 5'6" and wearing dark pants and a dark jacket with a white emblem on the upper left side of his chest walk into the Exxon Gas Station on February 2, 2014, three days after the robbery took place." (*Id.* ¶ 9.) Divel "recognized the individual as Plaintiff Brandon Watson because of his many prior run-ins with the Aberdeen Police Department. Specifically, Plaintiff had been arrested in the past for burglary and theft." (*Id.*) The station manager verified that this individual was a regular customer. (*Id.* ¶ 10.) Divel "noted that Plaintiff's height, build, skin color, and clothing matched the robbery suspect." (*Id.* ¶ 11.) At his request, the Aberdeen Police Department produced still photographs from the robbery footage and the February 2, 2014, footage. (*Id.* ¶ 12.) He stated,

> I compared the two photographs and based on the fact that the suspect and Plaintiff were the same height, same build, same skin color, wore identical clothing, that Plaintiff was familiar with the Exxon Gas Station employees and their habits, and had a long history of prior arrests, including arrests for burglary and theft, I determined that the photos showed the suspect and Plaintiff to be the same person.

(*Id.* ¶ 13.) Based on his conclusion, Divel applied for an arrest warrant for Plaintiff, which was issued on Feb. 6, 2014. (*Id.* ¶ 14; Ex. L.) The warrant cited charges of armed robbery, robbery, assault first degree, assault second degree, and theft less than $1,000. (Ex. L.) "Just prior to obtaining the warrant for Plaintiff's arrest, [Divel] directed then-Officer Thaddeus Tomlinson to detain Plaintiff in connection with the armed robbery of the Exxon Gas Station if he encountered Plaintiff while on patrol." (Divel Aff. ¶ 15, Nov. 4, 2015, Ex. A.)

In his affidavit, Defendant Tomlinson stated he was patrolling near the vicinity of the Exxon Gas Station on February 6, 2014, at approximately 4:24 p.m., when he saw Watson at the gas station and detained him. (Tomlinson Aff. ¶ 5, Nov. 6, 2015, Ex. N.) Tomlinson stated, "Plaintiff was detained without incident and without any more use of force than was necessary to execute the detention"; further, Watson did not complain of any injuries to Tomlinson or request

5

medical attention. (*Id.* ¶¶ 7-8.) Tomlinson transported Watson to the Aberdeen Police Department, and within two hours of the initial detention, Tomlinson executed the arrest warrant and released Watson into the custody of the department's Criminal Investigation Division. (*Id.* ¶ 9; Arrest Warrant, Ex. L.) Tomlinson did not further interact with Watson. (Tomlinson Aff. ¶ 10.)

Watson executed an "Explanation of Miranda Warnings" form (Defs.' Mot. Ex. M), but he refused to answer any questions posed to him by Divel. (Divel Aff. ¶¶ 17-18.) After Watson was transported to the Harford County Detention Center, Divel had no further contact with him. (*Id.* ¶ 22.) Divel attested that he never entered Watson's holding cell to question him or interact with Watson in any way, that other Aberdeen Police Officers never had to intervene to restrain him or prevent him from striking Watson, and that he never struck Watson or implied or made any motions to imply he was going to strike Watson. (*Id.* ¶¶ 19, 20, 21.)

The last Defendant sued, Budnick, attested that, in his position as Lieutenant with the Aberdeen Police Department, he has the responsibility of reviewing and approving incident reports written by departmental police officers. (Budnick Aff. ¶¶ 1-3, Nov. 3, 2015, Ex. Q.) On February 9, 2014, Budnick approved the supplemental incident report written by Divel following Watson's arrest. (*Id.* ¶ 4; Ex. B.) Budnick's responsibility did not require him to know the details of an incident, but to look for correct use of grammar and technical terms. (Budnick Aff. ¶ 5.) If Budnick observed that edits, changes, and/or corrections were needed, then he so noted that fact and sent the report back to the reporting officer to change; Budnick could not make edits, changes, and/or corrections himself. (*Id.* ¶¶ 6-7.) Budnick had no knowledge of the details of the robbery at the gas station, and he did not make any alterations to Divel's supplemental incident report. (*Id.* ¶¶ 8-9.)

In Watson's answers to interrogatories, he stated in pertinent part,

> Since Plaintiff has been released on bond, he has encountered Officer Thomilson [*sic*] several times in and around Aberdeen and in and around his neighborhood. Plaintiff maintains that Officer Thomilson [*sic*] has stated to him on numerous occasions that he should "watch his back" and that Plaintiff should "leave Aberdeen or else . . . ." Plaintiff's ex-girlfriend Latrice Parker has also had these remarks made to her by Officer Thomilson [*sic*] while Ms. Parker was still in a relationship with Plaintiff. Plaintiff has feared for his life.
>
> During the arrest, Detective Divel and the other arresting officers, forcibly handcuffed Plaintiff.
>
> In a separate incident, when Plaintiff went to the Police Barracks in Aberdeen to report a complaint regarding Officer Thomilson [*sic*], an unknown Sergeant (unknown to the Plaintiff) drew his weapon and told Plaintiff to leave the barracks.

(Defs.' Mot. Ex. R, ¶ 21.)

Also in response to an interrogatory about alleged harassment by Tomlinson, Watson stated,

> The first incident occurred when Defendant Tomilson [*sic*] arrested Watson near his home for a supposed drug charge that was never pursued. During this incident, Defendant Tomilson [*sic*] and another officer pushed Watson while he was in handcuffs and he fell onto the side mirror of the police vehicle—breaking the mirror and falling to the ground. While Watson was on the ground, Defendant Tomilson [*sic*] punched him in the ribs while Watson was still wearing handcuffs.[2]
>
> The second incident occurred during the arrest for the armed robbery at issue in this case. On February 6, Watson woke up and went to the Exon [*sic*] station to buy a scratch off ticket and that is when Defendant Tomilson [*sic*] came in to the station and told Watson to put his hands behind his back and told him that he was under arrest. Defendant Tomilson [*sic*] never read Watson his rights or told him what he was being arrested for. The employees of the Exon [*sic*] station even asked what he was being arrested for and even told Defendant Tomilson [*sic*] that it was not Watson who had robbed the station. The manager specifically told Tomilson [*sic*] that it was not Watson who had committed this crime. Watson was then taken back to the police station and put in an interrogation room with Officer Devil [*sic*] and another officer. The officers began to tell Watson that he had robbed the Exon [*sic*] station. Watson stated that

---

[2] The Court notes that this alleged incident, with no discernible date, was not included in Watson's complaint, which defines the framework of the case.

7

> he did not rob the gas station. This "questioning" went on for forty minutes—in which Watson kept repeating that he did not have anything to do with this crime. The officers told Watson that "they were giving out time" and showed him a picture of another guy who had gotten 20 years in jail and told Watson that they were going to do the same thing to him. Watson was then taken back to a cell and four or five officers including Devil [*sic*] and Tomilson [*sic*] gathered around and Officer Devil [*sic*] was trying to hit Watson while he was handcuffed stating that "he will fuck {him} up" and that "he is not like the other cops". The other officers were trying to hold Officer Devil [*sic*] back because he was trying to hit Watson and was cursing and screaming at him.
>
> The third incident took place after Watson was released on bond. Defendant Tomilson [*sic*] rode by Watson's house on his police bike, pointed his finger at Watson, who was outside at the time and started calling him names and said he was not "going to stop". He also said that "he was going to do thing [*sic*]" and that he didn't like Watson.

(Ex. S, ¶ 4.)

Also in response to an interrogatory, Watson stated,

> Watson went to the Aberdeen Police Department to file a complaint against Defendant Tomilson [*sic*] because Tomilson [*sic*] had rode [*sic*] by his house on his police bike and pointed his finger at Watson and was staring at him and calling him names. When he arrived at the station, Watson tried to tell a Sergeant at the front desk that he wanted to file a complaint and the Sergeant pulled out his gun and pointed it at Watson and told him that he was lying and that Defendant Tomilson [*sic*] did not do those things. Watson then left the station and called the Maryland State Police stating that he was in fear for his life. Plaintiff does not recall the date of this incident or the name of the Sergeant who pulled out his weapon.

(*Id.* ¶ 2.)

At his deposition, Watson admitted that Divel never touched him. (Watson Dep. 20:15-18, Sept. 24, 2015, Defs.' Mot. Ex. T.) Further, Watson was unable to identify the "sergeant" who allegedly pulled a gun and ordered Watson to leave the police station. (*Id.* 53:5-6.) Additionally, Watson admitted he never saw the "sergeant" pull his gun from the holster. (*Id.* 52:1—53:4.) Finally, Watson testified that he walked out of the police station (*id.* 52:2-11) and did not offer any evidence that he was "forcibly removed" therefrom. Watson's opposition is

unsupported by any affidavits or discovery materials. Apparently, he never deposed any parties or witnesses. (*See* Defs. Mot. Supp. Mem. 13-14.)

## IV. Analysis

Watson's case presents two basic questions: (1) whether his arrest was lawful and (2) whether he suffered any injuries for which he may be compensated. After reviewing the entire body of evidence in the record, the Court concludes Watson's arrest was indeed lawful and that he has presented no credible evidence of any injury suffered by him. Summary judgment, therefore, will be entered for Defendants.

### A. Count I – 42 U.S.C. § 1983

In Watson's first count pursuant to 42 U.S.C. § 1983, he claims that he was deprived of his rights under the United States Constitution's Fourteenth Amendment's Due Process Clause because of the Defendants' allegedly "arresting, imprisoning, assaulting, battering and committing other acts against [him.]" (Compl. ¶ 33.) He further claims that these alleged acts were done because he is African American. (*Id.* ¶ 34.) Defendants have reasonably construed his § 1983 count as claiming a violation of the Fourth Amendment. Watson also indicates in his opposition that his due process claim is based upon an alleged denial of substantive due process. (Pl.'s Opp'n 11.) In addition, Watson's claim may be construed as claiming a denial of equal protection, as guaranteed by the Fourteenth Amendment.

Because Watson was arrested after an application for arrest warrant had been made but just prior to the warrant's issuance, the Court will analyze the lawfulness of the arrest as being a warrantless one. "[A] warrantless arrest satisfies the Constitution so long as the officer has 'probable cause to believe that the suspect has committed or is committing an offense.'" *Virginia v. Moore*, 553 U.S. 164, 173 (2008) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 36

(1979)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). *See also Maryland v. Pringle*, 540 U.S. 366, 370-71 (2003). Thus, the pertinent inquiry is whether the particular factual contexts in the case before the court contribute to a valid finding of probable cause under the "totality of the circumstances." *Pringle*, 540 U.S. at 371.

In this case, Detective Divel directed Officer Tomlinson to detain Watson for the Exxon station robbery if Tomlinson were to encounter him in Tomlinson's patrol duty. If Divel had probable cause for Watson's arrest, then Divel's instruction to Tomlinson served as a valid basis for Tomlinson's arrest of Watson. *See Whiteley v. Warden*, 401 U.S. 560, 568 (1971) ("officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid" were doing so while in possession of probable cause); *United States v. Massenburg*, 654 F.3d 480, 492-93 (4th Cir. 2011) (*Whiteley* doctrine applies only to officers acting on information and instructions of other officers who have knowledge of facts establishing probable cause); *Ott v. State*, 600 A.2d 111, 115 (Md. 1992) (probable cause may be based upon information within collective knowledge of police).

Watson has unpersuasively argued that probable cause did not exist to support his arrest. He contends the suspect's skin color cannot be determined from the surveillance video and, further, that he was only arrested because his jacket matched that of the suspect. His argument rests upon truncation and distortion of the facts. That the original responding officers could not be sure whether the suspect was white or a light-skinned black does not govern Divel's later, definitive conclusion—the only conclusion that matters in this Court's evaluation of probable cause—derived from repeated viewings and study of the video. A copy of the surveillance video

supplied to the Court (Ex. H) shows unequivocally that the suspect may be considered African American, based upon his skin color.  In addition, Divel's affidavit explains that his conclusion was based upon the sameness of height, build, skin color, and clothing exhibited in the video of the suspect during the robbery and in the video of Watson coming into the station three days later, as well as the employees' belief that the suspect was a regular customer who knew the habits and procedures of the various employees and the station manager's identification of Watson as a regular customer.  Furthermore, Divel recognized Watson as someone previously convicted and arrested for various crimes, including burglary and theft.  The Court concludes Divel's decision to ask Tomlinson to arrest Watson is supported by probable cause, as assessed from the totality of the circumstances, and, further, that no genuine dispute of material fact exists on this question.  Thus, Watson's arrest was lawful and any claim he has made under the Fourth Amendment fails.

Watson's claim of denial of substantive due process is also without merit.  The Supreme Court has stated that "'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' . . . or interferes with rights 'implicit in the concept of ordered liberty.'"  *United States v. Salerno*, 481 U.S. 739, 746 (1987) (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)).  *See also County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998).  Watson has not made a plausible argument that Defendants' conduct shocks the conscience or interferes with any rights implicit in the concept of ordered liberty.  Hence, his claim premised on alleged denial of substantive due process fails.

Watson's implicit claim of denial of equal protection is based upon his allegation that his arrest and other actions of Defendants were "committed against him because he is African American." (Compl. ¶ 34.)  This allegation may be construed as asserting selective enforcement

of criminal laws on the impermissible basis of an individual's race. *See Whren v. United States*, 517 U.S. 806, 813 (1996). No evidence supports his claim. To advance such a claim, a plaintiff must not only show a defendant's conduct had a discriminatory effect but must also show the conduct was undertaken with discriminatory motive or intent. *United States v. Armstrong*, 517 U.S. 456, 465 (1996). Watson's racial discrimination claim premised upon a denial of equal protection thus requires proof he was treated differently from similarly situated individuals who are not in his protected class and proof that the difference in treatment is due to an intent to discriminate on the basis of Watson's race. *See id.*; *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). *See also Gairola v. Commw. of Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985) (applying Title VII discrimination proof scheme to § 1983 equal protection claim). Both direct evidence and circumstantial evidence may provide proof of discriminatory intent. *Batson v. Kentucky*, 476 U.S. 79, 93 (1986). Examples of circumstantial evidence are statements revealing a defendant's attitude toward someone of a particular race, *Mullen v. Princess Anne Volunteer Fire Co., Inc.*, 853 F.2d 1130, 1133 (4th Cir. 1988), and evidence of prior discriminatory practices, *Wyatt v. Sec. Inn Food & Beverage, Inc.*, 819 F.2d 69, 71 (4th Cir. 1987). Watson has pointed to no evidence of how similarly situated individuals not in his protected class were treated differently, and he has pointed to no evidence that would permit an inference of discriminatory intent. Watson's claim of denial of equal protection is, therefore, without merit. Because the record is devoid of evidence to support Watson's claim of denial of civil rights, the Court has no need to address Defendants' alternative argument of qualified immunity.

### B. Count II – Battery

Watson next asserts a state law claim of battery, alleging such occurred when "Defendants drew their weapons on Plaintiff and forcibly removed him from the Police Barracks. During Plaintiff's arrest on February 6, 2014, he was forcibly handcuffed and removed from his house." (Compl. ¶ 44.) As earlier noted in the statement of facts, no evidence supports any allegation of the officers drawing their weapons on Watson or of his being "forcibly removed" from the police barracks. Further, Watson's arrest was supported by probable cause; consequently, it was appropriate for Officer Tomlinson to handcuff him. If an arrest is not tortious, and Watson's arrest was not tortious, as will be explained *infra*, then the physical force used to effectuate the arrest is not tortious. *See Ashton v. Brown*, 660 A.2d 447, 471 n.24 (Md. 1995). This claim has no merit.

### C. Count III – False Arrest

This claim rests on Watson's argument that his detention was "without legal justification and without probable cause." (Compl. ¶ 48.) *See also Scott v. Jenkins*, 690 A.2d 1000, 1003 (Md. 1997) (claim of false arrest must be supported by proof that defendant deprived plaintiff "of his or her liberty and without legal justification"). Under Maryland law, a report of a felony and a description of the perpetrator may provide probable cause for an arrest. *Hopkins v. State*, 211 A.2d 831, 833 (Md. 1965). *See also* Md. Code Ann., Crim. Proc. § 2-202(c) (LexisNexis 2008) ("A police officer without a warrant may arrest a person if the police officer has probable cause to believe that a felony has been committed or attempted and the person has committed or attempted to commit the felony whether or not in the presence or within the view of the police officer.") Robbery is a felony in Maryland, Md. Code Ann., Crim. Law § 3-402(b) (LexisNexis 2012), and it is one of the charges concerning the gas station robbery for which Tomlinson

13

arrested Watson.  Having already concluded that Watson's arrest was lawful and supported by probable cause, the Court concludes no evidence supports this claim.

### D. Count IV – False Imprisonment

"'The elements of false imprisonment are the same as the elements for false arrest.'" *Green v. Brooks*, 725 A.2d 596, 605 (Md. Ct. Spec. App. 1999) (citation omitted).  *See also Manikhi v. Mass Transit Admin.*, 758 A.2d 95, 112 (Md. 2000) (elements of false imprisonment are "'a deprivation of the liberty of another without his consent and without legal justification'" (citation omitted)).  This claim has no merit for the same reasons the preceding counts have no merit.

### E. Count V – Intentional Infliction of Emotional Distress

A claim of intentional infliction of emotional distress has four elements:  (1) intentional or reckless conduct that is (2) extreme and outrageous and is (3) causally connected to the emotional distress, which is (4) severe.  *Id.* at 113.  No evidence supports this claim.  It is, therefore, without merit.

### F. Count VI – Gross Negligence

Under Maryland law,

> gross negligence is an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them.  Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.

*Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007).  This count, too, depends upon the arguments made previously and found to be unsupported by the evidence.  The same conclusion reached in the preceding discussion applies to this claim.  It has no merit.

### G. Count VIII – Violation of the Maryland Declaration of Rights

The final count of Watson's complaint asserts the same allegations of unlawful arrest and battery made earlier as a violation of the Maryland Declaration of Rights, Articles 24 and 26. (Compl. ¶ 70.) Article 24 is generally construed *in pari materia* with the Fourteenth Amendment, and Supreme Court decisions interpreting and analyzing the latter are treated by Maryland courts as authoritative interpretations of Article 24 as to both due process and equal protection. *Frey v. Comptroller*, 29 A.3d 475, 513 (Md. 2011). Similarly, Article 26 has been interpreted by Maryland courts as being *in pari materia* with the Fourth Amendment. *King v. State*, 76 A.3d 1035, 1041 (Md. 2013). Having found no evidentiary basis for Watson's claims under the Fourth and Fourteenth Amendments, the Court concludes Count VIII also fails.

### V. Conclusion

No genuine dispute of material fact exists with respect to any of Watson's claims, and Defendants are entitled to judgment as a matter of law. A separate order will issue.

DATED this 22nd day of April, 2016.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge